

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00170-CR

_____

GARY CARSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 14F0102-102

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Moseley
Dissenting Opinion by Justice Burgess

# O P I N I O N

In Bowie County, Texas, Gary Carson entered an open plea of guilty to three counts[1] of assault on public servants who were performing public servant duties, TEX. PENAL CODE ANN. § 22.01(b) (West Supp. 2016), the penalties being enhanced by previous convictions, TEX. PENAL CODE ANN. § 12.425 (West Supp. 2016), and three counts of bail jumping, TEX. PENAL CODE ANN. § 38.10 (West 2011). Carson elected to have the trial court assess punishment, and Carson executed a written waiver of his right to appeal before his plea and sentencing hearing. After a hearing, the trial court sentenced Carson to fifty years' imprisonment in each of the assault cases and ten years' imprisonment in each of the bail-jumping cases.[2]

During the hearing on Carson's motion for new trial, the trial court revealed that before Carson entered his guilty pleas, the trial court read the State's 404(b)[3] notice and, accepting several of the alleged extraneous offenses mentioned therein as true, relied on them in determining Carson's sentences. Upon hearing this, Carson objected. Carson's motion for new trial was overruled by operation of law.

---

[1]The charges were made through four separate indictments. Carson has filed a single brief raising the same issues in all four cases. We reach the same result in the other three cases, released today in separate opinions under cause numbers 06-15-00171-CR, 06-15-00172-CR, and 06-15-00173-CR.

[2]The assault charges were enhanced by two prior felony convictions, to which Carson pled true. The fifty-year sentences were to run concurrent to each other, and the ten-year sentences were to run concurrent to each other, but consecutively to the fifty-year sentences.

[3]Rule 404(b) requires the State to provide notice that it intends to introduce, in its case-in-chief, evidence of other crimes, wrongs, or acts. TEX. R. EVID. 404(b). Under Rule 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.

On appeal, Carson contends that (1) the certification of Carson's right of appeal wherein the trial court alleges that Carson has no right of appeal is incorrect; (2) Carson's waiver of appeal is invalid; and (3) considering the unproven extraneous offenses alleged in the State's notice shows that the trial court was biased against him, Carson was deprived of due process.

## I.    Factual Background

Carson was charged with (a) assaulting Officer Allen Scott Eudy and Officer Shawn Jacobs on or about January 26, 2014, (b) assaulting Sergeant James Michael on or about February 15, 2014, and (c) three counts of bail jumping/failure to appear. Eudy, Jacobs, and Michael were alleged to be public servants who were acting in that capacity. Carson entered an open plea of guilty to all charges and also entered a plea of true to two of the prior felony offenses which were listed in his indictment in order to prove up the requisite facts to support the State's habitual-offender allegations.

On August 10, 2015, the trial court accepted Carson's pleas to each charge, found him guilty of each charge, and sentenced him as to each charge. The trial court made certain that Carson understood that he was entering open pleas to all of the indicted charges and that he did "not have an agreement with the district attorney's office as to any punishment." Carson entered into evidence a set of medical records regarding his mental health issues, medications, and treatment "so that when he does go to the Texas Department of Criminal Justice, they will have some medical background on him." At one point in the hearing, Carson fell down and court personnel called an ambulance. At a later hearing, witnesses testified that Carson was lying on the floor shaking, comparing it to the shaking associated with seizures. Some of the State's witnesses

3

testified that they believed that Carson's collapse on the floor was only an act, but a paramedic who examined Carson testified that Carson had been dealing with an elevated heart rate. After that incident, the hearing was recessed and resumed after about twenty minutes.

Upon resumption of the hearing, the trial court sentenced Carson to fifty years' imprisonment in each of the assault cases and ten years' imprisonment in each of the bail-jumping cases, with the fifty-year sentences to run concurrently with each other, and the ten-year sentences to run concurrently with each other, but consecutively to the fifty-year sentences.

Although Carson was represented at the plea hearing by an attorney supplied by the public defender's office, Carson retained counsel to file a motion for new trial. The motion for new trial was based on allegations that the sentence was disproportionate to the crimes and that trial counsel was ineffective by not seeking to have the trial court disqualified because of his prior career as a police officer (which the movant hinted would have tainted the trial court's attitude against people who are alleged to have assaulted police officers), by failing to object to a disproportionate sentence, by failing to emphasize Carson's mental health issues, by failing to properly present those mental health issues to the trial court, and by failing to call some of Carson's family members and friends as witnesses to testify regarding Carson's long-standing mental health problems. At the hearing on the motion for new trial, Carson's mother, Mary Carson, and sister, Lacresha Carson, both testified that Carson's trial counsel did not contact them to testify at the punishment hearing. Tashara Fox, another of Carson's sisters, testified that she was willing to have been a witness and although she had spoken with Carson's trial counsel when she first learned that her brother was going to court, the attorney never contacted her to be a witness at the punishment

4

hearing. During the hearing on Carson's motion for new trial, the three women asserted that Carson had dealt with mental health problems from an early age. Mary admitted that she also suffered from problems with mental health issues. She and Fox testified that when Carson was thirteen or fourteen years old, he was beaten by a gang of men and kicked in the head and that he had experienced periodic blackouts ever since. Lacresha testified that her experience as a registered nurse showed her that Carson's actions, even as a child, indicated that he had mental health problems.

Carson's trial counsel, Will Williams, testified that Carson had claimed to him that he was in the throes of a blackout during each of the assaults on public servants with which he had been charged. Williams admitted that he had not called Lacresha, but that he did not learn of her existence until about three weeks before the punishment hearing (which was conducted on August 10). He acknowledged that he could have tried to contact her (but did not) in time for the hearing on the punishment phase. He also admitted that even though it was on short notice, he had called another of Carson's sisters, Mahagne Carson, and told her to get all the family members who wanted to testify to come to court.

Williams said that he believed that at one point, he had reached an agreement with the State by which Carson would plead guilty and receive a recommendation from it of thirty-five years' imprisonment, but the State informed him that the trial court would not comply with that request, so the proposed plea agreement was neither pursued further nor made a part of the record. The court's rejection of the proposed plea agreement concerned and surprised Williams because it made him feel "that whatever punishment [Carson] received if he went to the trial court would be

higher than 35 years." Williams testified that "[a]ny time the Judge has ever told me he wouldn't accept an offer, he always says, [']but we can have a hearing, and you can always change my mind.[']" The trial court confirmed that Williams has changed the trial court's mind in the past. Williams informed Carson that if the court determined sentencing, Williams expected a sentence of "somewhere [between] 45 to 50 [years], maybe higher." If Carson proceeded to a jury trial, Williams believed that—based on Carson's very lengthy prior criminal history—a jury would likely assess Carson a life sentence. Williams told Carson that his best chance for leniency in sentencing was to enter an open plea, take responsibility for his actions, and spare the court having to conduct a week-long jury trial. Even though there was no plea agreement in this case, Williams advised Carson to waive his right to appeal and admitted that Carson executed the waiver of appeal prior to sentencing.

At the conclusion of the hearing on the motion for new trial, the trial court commenced a soliloquy by explaining that it ordinarily "tr[ied] not to read the State's 404(b) notice" of intent to use extraneous offenses "until right before either a plea or a jury selection" because it did not "want to be influenced by what's in them." However, the court admitted that it had read the State's notice in this case either the evening before or "shortly before [Carson] appeared . . . on the open plea." The trial court mentioned the entire list of offenses contained in the notice, addressing each offense and describing the extent to which it played a role in his sentencing decision.

In general, the eight prior felony convictions listed in the notice "jumped out at" the court, as did the fact that three of them were "sexual type offenses." The court did not know "at the time

6

that the indecent exposure [offense] was what it was." The court also noticed the four assault cases listed, and though "most of them were misdemeanors, . . . they were still assault cases."

The trial court noted that the "very first felony offense" listed ("carnal abuse first degree"), happened on the same day as a residential burglary, and from that he "could pretty well tell" that the burglary was tied to the carnal abuse offense. The court admitted that the "sexual offense" coupled with "the sex offender failing to report, twice, two different cause numbers approximately two years apart, . . . played a huge role in the sentence I gave."

Continuing down the listed offenses, the court "noticed" that the offenses of possession of a controlled substance in 2007 (which was shown as a prior felony conviction, the existence of which Carson pled true for enhancement purposes), three separate offenses for assault causing bodily injury, injury to a child (the other enhancement in this case to which Carson pled true), and indecent exposure were all offenses in Bowie County. Two offenses for failure to identify himself "caught my attention" because, in the court's opinion, that meant Carson was "lying about who he is . . . and even though they're misdemeanors . . . that caught my attention." "At the sentencing on the assault charges, those are the things I considered, as far as [the] 404(b) notice."

Though the court said it did not consider the listed conviction for trespass of a habitation, the court noted that "it's got a Bowie County [cause] number," and, apparently imagining the underlying facts of the offense, mused that "[s]ometimes those [offenses] have a much more . . . chance of having some violence. I didn't really think this one did because it didn't go into any detail. So I didn't really consider that one very much."

7

The court recognized that the convictions for possession of marihuana and driving with an invalid license bore Bowie County cause numbers, but the court did not "consider [those] very heavily." Likewise, the court said that it did not take into consideration "any of the arrests that were shown in the State's 404(b) notice" unless they had cause numbers and convictions. Even though Carson's failures to appear for trial were "a huge inconvenience," the court did not consider those in determining Carson's sentence.

While the court believed that Carson faked his in-court fainting spell, the court stated that this incident had no effect on his sentencing. "What did have effect on me, though, was the prior felony convictions, and at that particular time, I thought the number was eight. . . . I [went] on the record to let y'all know that it was the habitual offender's paragraphs and his prior felony history" that affected the court's sentencing decision.

Carson then objected to the court's consideration of the alleged convictions contained in the State's notice in assessing punishment, arguing that other than the two offenses to which Carson pled true, the offenses in the notice were mere allegations and could not be factored into the court's determination of punishment. The court responded that it "didn't make up [its] mind on the 50 years until after [Carson] pled true."

**A.      Certification of Right to Appeal**

As of January 2003, the Texas Rules of Appellate Procedure have required the trial court to enter a certification of the defendant's right to appeal. TEX. R. APP. P. 25.2(a)(2). Under that Rule, the trial court must sign a certification of the defendant's right to appeal, and the appeal must

8

be dismissed if a certification showing the defendant has the right of appeal is not part of the record. TEX. R. APP. P. 25.2(a)(2), (d).

Here, the trial court's certification indicated that Carson's conviction came about as the result of a plea agreement and that Carson had no right of appeal. The State argues that the certification is accurate. Going further, it maintains that we must dismiss the appeal because Carson affirmatively waived his right to appeal and that Rule 25.2(d) of the Texas Rules of Appellate Procedure mandates dismissal. Carson contends that the trial court's certifications are erroneous and that we have the jurisdiction to determine if Carson's waiver of his right of appeal is valid.

The provisions of Rule 25.2 should not affect an appellant's substantive rights, such as his right to appeal. *Escochea v. State*, 139 S.W.3d 67, 71 (Tex. App.—Corpus Christi 2004, no pet.) (citing *Shankle v. State*, 119 S.W.3d 808, 812 (Tex. Crim. App. 2003) (right of appeal may not be abridged, enlarged, or modified by Rule 25.2)). Therefore, notwithstanding the provisions of Rule 25.2, we may address the validity of Carson's written waiver of the right to appeal even though the certification indicates that the defendant has no right of appeal. *See Washington v. State*, 363 S.W.3d 589, 589–90 (Tex. Crim. App. 2012) (per curiam) (determined waiver invalid and reversed court of appeals decision that dismissed defendant's appeal based on certification indicating waiver); *Escochea*, 139 S.W.3d at 71–72 (citing *Perez v. State*, 129 S.W.3d 282, 287–88 (Tex. App.—Corpus Christi 2004, no pet.) (discussing validity of written waiver of right to appeal)). We address both of Carson's points of error because they implicate the waiver's validity.

**B      Structural Error**

Carson argues that by basing its sentencing decision on the State's unproven allegations, the trial judge committed structural error, violating his right to due process of law.

When certain constitutional rights are violated, fundamental error occurs.  *See Arizona v. Fulminante*, 499 U.S. 279, 309–10 (1991).  Such errors are "structural defects in the constitution of the trial mechanism." *Id.* at 309.  These fundamental constitutional rights include the right to counsel, the right to an impartial judge, the right to not have members of the defendant's race unlawfully excluded from a grand jury, the right to self-representation at trial, and the right to a public trial. *Id.* at 309–10.  Fundamental rights "enjoy special protection in the system" in that they cannot be lost by inaction, but rather must be expressly relinquished. *Blue v. State*, 41 S.W.3d 129, 131 (Tex. Crim. App. 2000).

"Due process requires a neutral and detached hearing body or officer." *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)).  A defendant has an absolute right to an impartial judge at both the guilt/innocence and punishment stages of the trial.[4] *Hernandez v. State*, 268 S.W.3d 176, 184 (Tex. App.—Corpus Christi 2008, no pet.); *Jaenicke v. State*, 109 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).  In the absence of a clear showing to the contrary, we will presume that the trial

---

[4]In *Marin v. State*, the Texas Court of Criminal Appeals divided a defendant's rights into three categories: absolute rights, waiver-only rights, and forfeitable rights that must be implemented on request. *Marin v. State*, 851 S.W.2d 275, 278–80 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997).  The court further held that the requirement of Rule 33.1 of the Texas Rules of Appellate Procedure that a defendant must object to preserve error does not apply to rights falling within the first two categories. *See Marin*, 851 S.W.2d at 279–80; *see also Blue*, 41 S.W.3d at 137 (Keasler, J., concurring) (explaining the history of the *Marin* framework).  Barring an express waiver of the right, error alleging that the trial court disregarded an absolute, structural right may be raised for the first time on appeal. *Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004).

court was neutral, detached, and unbiased in all phases of the trial. *Brumit*, 206 S.W.3d at 645 (citing *Thompson v. State*, 641 S.W.2d 920, 921 (Tex. Crim. App. [Panel. Op.] 1982)).

"Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). The terms "bias" and "partiality" do not encompass all unfavorable rulings towards an individual. Instead, they must:

> connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because is rests upon knowledge that the subject ought not to possess (for example, a criminal juror who has been biased or prejudiced by receipt of inadmissible evidence concerning the defendant's prior criminal activities), or because it is excessive in degree."

*Id.* at 550. A ruling or decision made in reliance on an extrajudicial[5] source is sufficient to show bias and deprivation of due process because it results "in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966); *see Liteky*, 510 U.S. at 554–56; *Kemp v. State*, 846 S.W.2d 289, 305–06 (Tex. Crim. App. 1992). Under the same legal principle, a juror is disqualified for bias if they are unable or unwilling to render a verdict based solely on the evidence presented in court. *See Patton v. Yount*, 467 U.S. 1025, 1037 n.12 (1984).

Here, the trial court read the notice prior to Carson's guilty plea, his waiver of his rights of appeal, and the plea and sentencing hearings themselves.[6] The notice alleged, in pertinent part, prior offenses in both Miller County, Arkansas, and Bowie County, Texas:

---

[5]Extrajudicial is defined as "[o]utside court" or "outside the functioning of the court system," and "[n]ot done or made as a part of a judicial proceeding." *Roman v. State*, 145 S.W.3d 316, 321 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (quoting *Extrajudicial*, BLACK'S LAW DICTIONARY (7th ed. 1999)).

[6]The trial court did not err by reading the notice. Its error lay solely in failing to set aside this knowledge and rule only on the evidence properly before it.

11

Alleged convictions from Miller County, Arkansas, included the following:

- Carnal Abuse, 1st degree

- Two counts of Residential Burglary

- Domestic Battering, 3rd Degree, and Criminal Contempt

- Sex Offender Failing to Report Change of Address

- Failure to Register or Comply with Reporting Requirements of Sex Offender Registration Act

Alleged convictions from Bowie County, Texas, included the following:

- Two counts of Possession of a Controlled Substance

- Assault Causing Bodily Injury/Family Violence

- Two counts of Assault Causing Bodily Injury

- Injury to a Child

- Sexual Assault of a Child

- Indecent Exposure

- Two counts of Failure to Identify/Fugitive of Justice

- Criminal Trespass of a Habitation

- Possession of a Controlled Substance (Marihuana)

- Burglary of a Habitation

- Driving While License Invalid

Carson pled true to only two of the prior felony convictions listed in the notice (possession of a controlled substance and injury to a child). There is simply no evidence in the record to support,

12

let alone prove, that Carson committed any of the other offenses alleged in the notice. The others stand only as allegations.

Despite the unique facts of this case, a somewhat similar issue arose during the sentencing hearing in *Williams v. Oklahoma*, a hallmark case upon which the dissent primarily relies. *Williams v. Oklahoma*, 358 U.S. 576 (1959). Williams robbed a gas station in Tulsa County, forced his way into Cooke's car, and at gun point, forced Cooke to drive him to Muskogee County, where he murdered Cooke and stole his car. *Id.* at 577–78. Williams received a life sentence in Muskogee County for the murder, and he subsequently pled guilty to the kidnapping charge in Tulsa County. *Id.* at 578. During the sentencing hearing, the State (which was seeking the imposition of a death sentence) recounted the armed robbery, the ensuing police chase and "the gruesome details" of Cooke's kidnapping and murder. *Id.* at 579. Without first providing any evidence to support the listed crimes, the State also recounted Williams' prior criminal history as shown by Federal Bureau of Investigation records, including grand theft, escape, two violations of the Dryer Act,[7] and armed robbery. *Id.* at 579–80, 80 n.4. Williams, pleading for a life sentence, then introduced a transcript from the sentencing proceedings in the Muskogee murder case. *Id*. at 580. After a two-day recess, the trial court reconvened the sentencing hearing, "called [Williams] to the bar[,] and asked him whether he wished to make any correction in the statement that had been made to the court by the State's Attorney. [Williams] answered that he did not, and that the matters related in that statement were true." *Id.* The court sentenced Williams to death, noting

---

[7] 18 U.S.C.A. § 10 (West, Westlaw through P.L. 114-254 Jan. 9, 2017).

that in doing so, it had considered the State's argued facts and Williams' admission that the State's statement was true. *Id.* at 581.

On appeal to the United States Supreme Court, among Williams' arguments was a claim that his rights to due process and fundamental fairness were violated because the trial court allowed the State to make unsworn statements regarding the details of the crime and his criminal history and that the court considered these in imposing the sentence on the kidnapping charge. *Id.* The Supreme Court held that Williams' rights to due process and fairness were not violated. That holding was based on the fact that Williams failed to request that the State produce evidence of its argued aggravating factors and that since guilt had been properly established, the trial court, in determining the sentence, was "not restricted to evidence derived from the examination and cross-examination of witnesses in open court" but could also consider the content of the State's argument because it was "responsible unsworn or 'out-of-court' information relative to the circumstances of the crime and to the convicted person's life and characteristics." *Id.* at 583–84.

The facts of *Williams*, however, are readily distinguishable from those of the present case. In that case, the trial court specifically questioned the defendant regarding the State's unproven allegations, and he admitted in response to that questioning that the "State's Attorney's statement of the details of the crime and of [his] criminal record" were true. In contrast, with the case now at bar, Carson was provided no such opportunity to contest the contents of the State's 404(b) notice prior to the trial court's reliance on those unproven allegations in determining his sentence. *Id.* at 584. In other words, in the *Williams* case, the trial court informed Williams that in determining his sentence, the court had considered the unproven allegations of the State's argument before it

14

ruled, and though it gave Williams the opportunity to attempt to rebut them, he effectively admitted the veracity of the allegations. Here, Carson was given no such notification, but rather, was only told about the reliance the trial court had placed on the existence of the unproven allegations after sentence had been pronounced. *See id.* at 583–84. Accordingly, we find *Williams* inapplicable to the present case.

Here, at the conclusion of the hearing on Carson's motion for new trial, the trial court orally recounted the long list of offenses in the Rule 404(b) notice, one at a time, explaining in great detail if, how, and to what degree each of the allegations affected its decision regarding Carson's sentence. Even though Carson was given no notice that they were being considered and was provided no opportunity to contest any of them, the trial court made it quite clear that several of the alleged—but unproven—felonies listed in the notice "played a huge role in the sentence [the court] gave" Carson. *See id.* at 577–78. Therefore, by its own admission, the trial court's sentencing decision was not based on "what the judge learned from his participation in the case." *See Grinnell*, 384 U.S. at 583. Rather, the record reflects that the court's sentencing decision was based on the supposition that the trial court should never have considered—that Carson had been finally convicted of about a dozen extraneous felony offenses as alleged in the State's notice. *See Liteky*, 510 U.S. at 550. The presence on the bench of a judge who is not impartial deprives a defendant of his basic protections, and because it is a defect that affects the very framework within which the trial proceeds, it infects the entire trial process. *Fulminante*, 499 U.S. at 309–10; *see also Neder v. United States*, 527 U.S. 1, 8 (1999); *Jordan v. State*, 256 S.W.3d 286, 290 (Tex. Crim. App. 2008). Therefore, we find that Carson's fundamental rights were violated, and we

15

reverse the case for a new sentencing hearing.  *See* TEX. CODE CRIM. PROC. ANN. art. 44.29(b) (West Supp. 2016);[8] *Fulminante*, 499 U.S. at 309–10 (structural error requires automatic reversal); *Johnson v. State*, 169 S.W.3d 223, 232–35 (Tex. Crim. App. 2005) (no harm analysis required).

Because the structural error in this case infects the trial process itself, it necessarily invalidates Carson's waiver of his right to appeal because at the time he executed the waiver, it was not possible for him to have known that the trial court would base its sentence on extrajudicial evidence.  *See Ex parte Delaney*, 207 S.W.3d 794, 799–00 (Tex. Crim. App. 2006) (presentence waiver without agreement on punishment was invalid because the defendant "could not know what errors might occur at the sentencing phase"); *Monreal v. State*, 99 S.W.3d 615, 617 (Tex. Crim. App. 2003) (valid waiver of appeal must be made voluntarily, knowingly, and intelligently).  To rule otherwise would lead to an absurd result—in the face of a presentence waiver of appeal, the State and/or trial court could violate a defendant's fundamental rights carte blanche while leaving the defendant with no recourse on appeal.  As detailed below, even if we were to determine that

---

[8]Article 44.29(b) of the Texas Code of Criminal Procedure states:

> If the court of appeals or the Court of Criminal Appeals awards a new trial to a defendant other than a defendant convicted of an offense under Section 19.03, Penal Code, only on the basis of an error or errors made in the punishment stage of the trial, the cause shall stand as it would have stood in case the new trial had been granted by the court below, except that the court shall commence the new trial as if a finding of guilt had been returned and proceed to the punishment stage of the trial under Subsection (b), Section 2, Article 37.07, of this code.  If the defendant elects, the court shall empanel a jury for the sentencing stage of the trial in the same manner as a jury is empaneled by the court for other trials before the court.  At the new trial, the court shall allow both the state and the defendant to introduce evidence to show the circumstances of the offense and other evidence as permitted by Section 3 of Article 37.07 of this code.

TEX. CODE CRIM. PROC. ANN. art. 44.29(b).

16

there was no structural error committed in this case, the waiver of appeal is invalid due to a failure of consideration.

### C. Carson's Execution of a Waiver of His Right to Appeal

Carson also contends that the waiver he executed is invalid because the State failed to give consideration for the attempted waiver.[9]

A defendant in any criminal action has a right to appeal. TEX. CODE CRIM. PROC. ANN. art. 44.02 (West 2006). However, a defendant in a non-capital felony case may waive any rights secured to him by law, including the right of appeal. TEX. CODE CRIM. PROC. ANN. art. 1.14 (West 2005). Texas has "long held that a valid waiver of appeal prevents a defendant from appealing without the trial court's consent." *Monreal v. State*, 99 S.W.3d 615, 617 (Tex. Crim. App. 2003). A valid waiver of the right to appeal is one that was made voluntarily, knowingly, and intelligently. *Id.*; *Ex parte Tabor*, 565 S.W.2d 945, 946 (Tex. Crim. App. 1978).

For many years, the Texas Court of Criminal Appeals held that waivers of appeal made before trial or before sentencing were invalid because: (1) notices of appeal that were filed

---

[9]Carson also contends that his claim of judicial bias may be addressed under the *Rankin/Young* exception. *Rankin v. State*, 46 S.W.3d 899, 901 (Tex. Crim. App. 2001); *Young v. State*, 8 S.W.3d 656, 666–67 (Tex. Crim. App. 2000). A voluntary plea of guilty or nolo contendere entered with or without an agreed recommendation of punishment by the State waives all nonjurisdictional errors which may have occurred before entry of the plea. *Helms v. State*, 484 S.W.2d 925 (Tex. Crim. App. 1972). In *Young*, the Court of Criminal Appeals modified the *Helms* rule so that if a defendant enters a valid plea of guilty or nolo contendere, whether or not he received an agreed recommendation of punishment, he waives or forfeits the right to appeal an error "when the judgment of guilt was rendered independent of, and is not supported by, the error." *Rankin*, 46 S.W.3d at 901 (citing *Young*, 8 S.W.3d at 666–67). That is—a defendant pleading guilty or no contest may still appeal an error when the judgment of guilt depends upon or is supported by the error. *Young*, 8 S.W.3d 666–67. There is caselaw holding that the *Helms* rule does not apply to errors "occurring at or after entry of [the] plea," *McCain v. State*, 24 S.W.3d 565, 568 (Tex. App.—Waco 2000), *pet. granted by Ex parte McCain*, 67 S.W.3d 2014 (Tex. Crim. App. 2002) (quoting *Daw v. State*, 17 S.W.3d 330, 331 (Tex. App.—Waco 2000, no pet.)). Due to our ruling in this case, we need not address whether Carson's claims fall within the *Young* exception.

17

prematurely were ineffective, as the defendant's right of appeal had not yet matured; (2) such waivers were not knowingly or intelligently executed because a defendant could not anticipate unknown errors that might occur during trial or sentencing; and (3) before he was sentenced, a defendant could not know with certainty what punishment would be assessed. *Ex parte Thomas*, 545 S.W.2d 469, 469–70 (Tex. Crim. App. 1977); *Ex parte Townsend*, 538 S.W.2d 419, 420 (Tex. Crim. App. 1976). However, in *Blanco v. State*, the court upheld a waiver of appeal that was executed after conviction, but before sentencing, because it was executed in exchange for a plea agreement with a recommended sentence, and there was no compelling reason why the defendant should not be held to his bargain. *Blanco v. State*, 18 S.W.3d 218, 219–20 (Tex. Crim. App. 2000). The court reasoned that the three issues raised in *Thomas* and *Townsend* did not apply to *Blanco* because the law had changed to allow prematurely filed notices of appeal to be effective, and the recommended sentence in *Blanco* eliminated any uncertainty as to potential errors in the punishment phase and the sentence itself. *Id.*

However, in *Ex parte Delaney*, Delaney entered an open plea to aggravated robbery and as a part of his stipulation of evidence, he also executed a presentence waiver of his right to appeal. *Ex parte Delaney*, 207 S.W.3d 794, 795 (Tex. Crim. App. 2006). He was placed on deferred adjudication community supervision for ten years, but it was later revoked, and he was sentenced to life in prison. *Id.* Because the trial court denied him permission to appeal, he filed an application for writ of habeus corpus that claimed he was improperly denied his right to appeal. *Id.* The court held that Delaney's waiver was invalid because it was executed prior to sentencing and without an agreement on punishment. *Id.* at 799. In so finding, the court stated:

18

When [Delaney] waived his right of appeal at the time he agreed to deferred adjudication, he could not know what errors might occur at the sentencing phase of trial or what punishment would be assessed if guilt was adjudicated. Therefore, [Delaney's] waiver was not knowing and intelligent and does not bar him from appealing from the punishment phase of trial. Relief is granted, and the trial court is instructed to certify [Delaney's] right to appeal issues related to his sentence.

*Id.* at 799–800.

In *Ex parte Broadway*, the court filled in some of the gray area between *Blanco* and *Delaney*. The defendant in *Broadway* declined the State's plea-bargain offer of twenty-five years' imprisonment, entered an open plea, and executed a presentence waiver of his right to appeal "with the hope that the judge would place him on deferred-adjudication community supervision with drug treatment." *Ex parte Broadway*, 301 S.W.3d 694, 696 (Tex. Crim. App. 2009); *see* TEX. CODE CRIM. PROC. ANN. art. 1.13 (West Supp. 2016). The trial court found that the State did not want to consent to his waiver of a jury trial, but according to an affidavit from one of his attorneys, Broadway executed the presentence waiver "in order to induce the [S]tate to waive its right to force a jury trial in order that he could ask the court to give him deferred adjudication [community supervision] with drug treatment." *Broadway*, 301 S.W.3d at 696. After the punishment phase of the trial, the trial court assessed a punishment of twenty-five years' imprisonment. *Id.* at 695. Upon considering Broadway's application for writ of habeas corpus, the court distinguished that case from *Delaney* and upheld the presentence waiver, finding that even though there "was not a plea bargain," there was a bargain "of a different sort" in that case because, by agreeing to waive its right to a jury trial—something it did not want to do—the State gave consideration for the waiver. *Id.* at 695–97.

19

Very similar circumstances to those in *Broadway* are found in the recent case of *Jenkins v. State*, where the defendant rejected a plea agreement, but later entered an open plea without a recommendation from the State on punishment. *Jenkins v. State*, 495 S.W.3d 347, 349 (Tex. App.—Houston [14th Dist.] 2016, no pet.). At the plea hearing, the trial court reminded the defendant that he had entered an open plea with "no promises whatsoever" and that he could be sentenced "anywhere from deferred up to 99 or life." *Id.* As a part of his plea and confession, he also entered a waiver of his right to appeal. A jury trial was waived and the trial court sentenced him to twelve years' confinement and made an affirmative deadly-weapon finding. *Id.* at 349–50. On appeal, the State cited *Broadway* and argued that it gave consideration for Jenkins' waiver of his right to appeal because it consented to his waiver of a jury trial. *Id.* at 351. Though the State's agreement to waive a jury trial did allow the court to consider deferred adjudication on punishment, the court noted that there was no evidence that Jenkins negotiated with the State to obtain that benefit in exchange for the waiver, and, unlike *Broadway*, there was no finding or evidence that the State did not want to consent to waiving a jury trial. *Id.* at 352. The court of appeals held the waiver to be invalid because the State's agreement to waive a jury trial was not a benefit that the parties bargained for. *Id.* at 351–52.

As in *Broadway*, in the case under examination here, the State agreed to waive a jury trial on guilt/innocence and argues that its agreement was consideration[10] for Carson's presentence

---

[10] The State also argues that it dropped enhancement paragraphs from the bail-jumping charges, but there is no evidence that the enhancements were dropped pursuant to any negotiation or agreement with Carson in exchange for his presentence waiver.

20

waiver of his right to appeal.[11]   However, the State's agreement in *Broadway* provided a legal benefit to the defendant because it allowed the court to consider deferred adjudication in sentencing, whereas here, the State's agreement provided Carson with no such value.[12] Irrespective of any agreement with the State, Carson was ineligible for deferred adjudication due to the nature and details of his case, so he would gain no advantage in that regard.  Further, in light of Carson's open plea of guilty to the offenses and true as to the enhancements, neither his guilt nor the enhancements were at issue.  Accordingly, (considering Carson's willingness to admit those things), a jury trial on guilt/innocence with the enhanced punishments would serve no purpose other than to waste judicial time and resources.  Therefore, the facts of this case are distinguishable from those of *Broadway*, and we find that Carson's presentence waiver was unknowing and invalid as to any error in the punishment/sentencing phase of the trial because Carson was in no position to know the nature of the claims he could have brought on appeal in the absence of the waiver.[13]  *See Ex parte Reedy*, 282 S.W.3d 492, 498 (Tex. Crim. App. 2009); *see also Broadway*, 301 S.W.3d at 695–96; *Delaney* 207 S.W.3d at 799.

---

[11]Carsons' counsel testified that he "negotiated to get the State to waive a jury" trial in exchange for Carson's waiving his right to appeal.

[12]Other types of legal bargains can constitute sufficient consideration to validate a presentence waiver, including, but not limited to:  (a) pleading guilty in one case, without an agreement on punishment, in return for the dismissal of other offenses; (b) an agreement that a deadly-weapon finding would not be sought or made; or (c) the State abandoning an enhancement paragraph.  *Broadway*, 301 S.W.3d at 699 (Womack, J., concurring).

[13]A waiver will be voluntarily, "knowingly and intelligently made only under circumstances in which, and to the extent that, [the defendant] is aware of what has occurred in the trial proceedings [because] [o]nly then is he in a position to know the nature of the claims he could have brought on appeal but for his waiver." *Ex parte Reedy*, 282 S.W.3d 492, 498 (Tex. Crim. App. 2009).

## D. The Trial Court's Error Was Harmful

We have previously determined that the consideration by the trier of fact of the alleged convictions for which no proof was presented amounts to structural error which caused the entire sentencing process to be invalid. "A 'structural' error 'affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself,'" and is not amenable to a harm analysis. *Jordan v. State*, 256 S.W.3d 286, 290 (Tex. Crim. App. 2008) (quoting *Fulminante*, 499 U.S. at 310).

However, even if we consider, arguendo that there had been no structural error in the case, it was still error for the trial court to have relied upon unproven facts that were not in evidence. *See* TEX. R. EVID. 101(b), (d); TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a) (West Supp. 2016). In most situations, the question of the consideration of facts which are not in evidence involves a jury trial, not a bench trial. When a jury's factual determination is involved and there is a possibility that the jury heard facts that were not placed into evidence, the appellate court is placed in the position of determining whether those facts had an impact on the outcome of the case and, if so, whether the impact was harmful to the appellant. *Schmutz v. State*, 440 S.W.3d 29, 40 (Tex. Crim. App. 2014). That is not the case we have here. In Carson's situation, the trier of fact expressed on the record that the non-evidentiary facts were taken into account and that many of those unproven factors had a major impact on the trial court's determination of the sentence to be meted to Carson. The trial court apparently rejected a proposed pretrial plea agreement wherein Carson would have received a thirty-five-year sentence, but after considering facts and prior convictions not in evidence, the court sentenced Carson to serve two concurrent fifty-year

22

sentences, followed consecutively by two concurrent ten-year sentences—a sentence that was some fifty-eight percent more burdensome than that originally proposed by the State. This was plainly harmful error which adversely impacted Carson. Although Carson was unaware until the hearing on the motion for new trial that the trial court had considered these things in arriving at the sentences, he preserved the error by objecting to the procedure as soon as it was discovered. In this circumstance, harmful error has been committed.

We affirm Carson's conviction of assault on a public servant with the enhancement of the penalty as shown in the indictment. However, we reverse the assessment of the punishment and remand this matter to the trial court for further proceedings.

## II. Modification of the Trial Court's Certification of Carson's Right to Appeal

If the appellate court determines that the certification is defective (contrary to the record), the clerk must notify the parties so that the defect can be remedied. TEX. R. APP. P. 37.1; *Harris v. State*, 137 S.W.3d 829, 830–31 (Tex. App.—Waco 2004, no pet.) (per curiam); *Hargesheimer v. State*, 126 S.W.3d 658, 659–60 (Tex. App.—Amarillo 2004, pet. ref'd) (per curiam). If that action does not produce a valid certification, the appellate court may order the trial judge to provide one. TEX. R. APP. P. 34.5(c).

Here, during the plea/sentencing hearing, the trial court reminded Carson that he was entering open pleas, that he had executed a waiver of his right to appeal, and that the court would determine punishment. However, the trial court's certification of Carson's right to appeal, signed by the trial court on August 10, 2015, indicated that this was a plea bargain case and, therefore, that he had no right to appeal. Carson filed a motion to change the certification, and during the

23

hearing, argued that his case was not controlled by Rule 25.2 because it was not a plea bargain case; the trial court rejected that argument. After receiving the record and certification in this case, this Court sent a letter to the trial court noting the apparent inaccuracy of the certification and requesting that the trial court file a supplemental clerk's record containing an accurate certification or other documentation demonstrating the accuracy of the current certification. In response, we received a supplemental clerk's record containing the court's docket sheets, a receipt of exhibits, and the same inaccurate certification.

Under Rule 25.2, a plea bargain case is "a case in which a defendant's plea was guilty or nolo contendere and the punishment did not exceed the punishment recommended by the prosecutor and agreed to by the defendant." TEX. R. APP. P. 25.2(a)(2). Here, Carson entered open pleas of guilty to the crimes with which he was charged and entered a plea of true as to the cases used for enhancement. The State made no recommendations as to the sentences; therefore, Carson's cases were not plea bargain cases for the purpose of the certification of the right of appeal. *See Dears v. State*, 154 S.W.3d 610, 613 (Tex. Crim. App. 2005).

Due to our ruling hereinabove, Carson has a right to appeal. In the light of our previously unsuccessful attempt to obtain an accurate certification from the trial court, and in order to expedite this case, we hereby modify the certification to show that Carson possesses the right to appeal. *See* TEX. R. APP. P. 2 (court of appeals may suspend the Rules of Appellate Procedure "to expedite a decision or for other good cause").

We affirm Carson's conviction of assault on a public servant with the enhancement of the penalty as shown in the indictment. However, we reverse the assessment of punishment and remand this matter to the trial court for further proceedings.

Bailey C. Moseley
Justice

**DISSENTING OPINION**

I agree that Carson has not waived his right of appeal under Rule 25.2 of the Texas Rules of Appellate Procedure and that the trial court erred in relying on the Rule 404(b) notices in the clerk's file in deciding the sentence in this case. I disagree with the majority's conclusion that the trial court's error was structural, constitutional, and/or harmful and that we are required to reverse Carson's sentence and remand the case for a new punishment hearing. Therefore, I respectfully dissent.

I.      **Introduction and Issues Presented**

The United States Supreme Court has held that the Due Process Clause of the Fourteenth Amendment does not mandate the same level of formality at the sentencing phase of trial that is required at the guilt/innocence phase. *See Williams v. New York*, 337 U.S. 241, 246 (1949); *Williams v. Oklahoma*, 358 U.S. 576 (1959). The first question presented in this case is, how informal can a sentencing hearing be before it violates due process? Specifically, did the trial court violate Carson's right to due process at sentencing by considering his criminal history as reflected

25

in the State's Rule 404(b) notice, even though the State failed to introduce any evidence at the sentencing hearing to support the allegations in that notice, but where the notice was filed with the court, the notice was provided to Carson before trial, together with copies of the final judgments of conviction supporting that criminal history, and the State argued that criminal history at sentencing without objection? I believe that on the record presented in this case and because the trial court specifically limited its consideration of the Rule 404(b) notice to only the adjudicated offenses listed in that notice, it did not violate Carson's right to due process guaranteed by the United States Constitution.

However, the Legislature has created a sentencing procedure which exceeds the minimum federal constitutional requirements. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a) (West Supp. 2016). I believe that the trial court's consideration of the State's Rule 404(b) notice was a violation of Article 37.07, Section 3(a), because the judgments of conviction supporting the notice were not actually admitted into evidence. Thus, the second question presented here is whether the trial court's error was harmful. Although I believe the second question is a much closer call than the first one, for the reasons stated herein, I believe the trial court's nonconstitutional error was harmless under Rule 44.2(b) of the Rules of Appellate Procedure. Accordingly, I would affirm the trial court's sentence in this case.

### A. The Procedural History Prior to Trial

Carson was indicted on October 2, 2014, with three charges of assault on a public servant. He appeared before the trial court at numerous pretrial hearings prior to indictment. On July 6,

2015, the State filed its Notice of Intent to Use Extraneous Offenses.[14]  At a pretrial hearing held

July 13, 2015, Carson, his counsel, and the State appeared before the trial court to enter a plea of

---

[14]The State's Rule 404(b) notice alleges, in part:

- That the defendant, Gary Carson, committed the offense of Carnal Abuse 1st Degree, on or about September 21, 1997, in Miller County, Arkansas.  Defendant was convicted of the same on or about April 11, 2006[,] in cause Number CR-97-454.  A sentence of probation was later revoked.

- That the defendant, Gary Carson, committed the offense of Residential Burglary (x2), on or about August 21, 1997, and September 21, 1997, in Miller County, Arkansas.  Defendant was convicted of the same on or about April 11, 2006, in Cause Number CR-97-454.  A sentence of probation was later revoked.

- That the defendant, Gary Carson, committed the offense of Domestic Battering 3rd Degree and Criminal Contempt on or about December 2, 2004, November 21, 2004, and March 4, 2005[,] in Miller County, Arkansas.  He was convicted of the same on or about April 11, 2006[,] in cause numbers CR-2005-35 and CR 2005-589.

- That the defendant, Gary Carson, committed the offense of Sex Offender Failing to Report Change of Address on or about April 6, 2006, in Miller County, Arkansas.  The defendant was convicted of the same on or about April 11, 2006, in cause number CR-2005-589.

- That the defendant, Gary Carson, committed the offense of Failure to Register or Comply with Reporting Requirements of Sex Offender Registration Act on or about April 4, 2007[,] in Miller County, Arkansas.  Defendant was convicted of the same on or about January 29, 2008[,] in cause number CR-2007-788.

- That the defendant, Gary Carson, committed the offense of Possession of a Controlled Substance, on or about April 4, 2007, and convicted of the same in cause number 07F0651-102.

- That the defendant, Gary Carson, committed the offense of Assault Causing Bodily Injury/Family Violence and was convicted of the same on or about September 7, 2004[,] in cause number 04M1635-CCL.

- That the defendant, Gary Carson, committed the offense of Possession of a Controlled Substance on or about March 4, 2005, and was convicted of the same on or about April 20, 2006, in cause number 06F019-102.

- That the defendant, Gary Carson, committed the offense of Assault Causing Bodily Injury and was convicted of the same on or about June 18, 1987[,] in cause number 97M794-5.

- That the defendant, Gary Carson, committed the offense of Assault Causing Bodily Injury and was convicted of the same on or about October 29, 2004[,] in cause number 04M1952-CCL.

guilty to the three charges of assault on a public servant and to then try punishment to the trial court, non-jury, in exchange for the State's agreement to drop certain of the enhancement paragraphs. However, before the plea hearing began, Carson informed the trial court that he wanted to hire an attorney to substitute for his court-appointed counsel. He also informed the trial court that he did not wish to enter a plea of guilty as previously indicated. The State responded,

> This case is a year and a half old. The State of Texas requires 10 days notice for a jury trial. He obviously has had that. We were all under the impression there was going to be a guilty plea this morning. The State of Texas is ready. Tomorrow I say we pick a jury, and we go forward. We just have to dispose of these cases. These victims are ready for trial. . . . And it's time to go forward.

---

- That the defendant, Gary Carson, committed the offense of Injury to a Child and on or about August 30, 2000[,] and was convicted of the same on or about October 22, 2002[,] in cause number 00F672-102.

  . . . .

- That the defendant, Gary Carson, committed the offense of Indecent Exposure and was convicted of the same on or about November 1, 2002[,] in cause number 02M1948-CCL.

- That the defendant, Gary Carson, committed the offense of Failure to Identify Fugitive of Justice and was convicted of the same on or about June 18, 1997[,] in cause number 97M795-5.

- That the defendant, Gary Carson, committed the offense of Failure to Identify Fugitive of Justice and was convicted of the same on or about October 29, 2004, in cause number 04M0271-CCL. . . .

  . . . .

- That the defendant, Gary Carson, committed the offense of Possession of Marijuana and was convicted of the same on or about November 30, 2012[,] in cause number 07M0956-CCL.

  . . . .

- That the defendant, Gary Carson, committed the offense of Driving While License Invalid and was convicted of the same on or about April 22, 2005[,] in cause number 05M0743-CCL.

28

In response, Carson's court-appointed counsel informed the trial court,

> Your Honor, I can be ready. I am ready for trial due to a stipulation made by the State. I do have some medical evidence that we won't have a sponsoring witness for, but the State has agreed to stipulate to the medical records, the mental health records. . . . As far as the guilt/innocence side, I have been provided videos of all three assaults, alleged assaults, and *I've been provided all judgments on the extraneous allegations.* I've been provided police reports on many of the Arkansas allegations including extraneouses that did not result in convictions. I believe that the State has fully tendered everything they have to tender. I've reviewed it all, and I'll be prepared for tomorrow.

(Emphasis added).

The State then rescinded all its previous plea offers and, after the trial court admonished the defendant concerning the ramifications of his decision, recessed the hearing with jury selection to begin the next morning. The next morning, however, Carson failed to appear, and the trial court dismissed the jury panel. The State subsequently indicted him for failure to appear. On August 5, 2015, Carson appeared before the trial court where he waived arraignment and entered a plea of not guilty to the new failure to appear charge. The trial court then scheduled jury selection for all of the pending charges for the following Tuesday morning.

### B. The Sentencing Hearing

On August 20, 2015, the day before jury selection, Carson reappeared before the trial court where he entered his pleas of guilty to three charges of assault of a public servant and three counts of failure to appear. After admonishing Carson of his rights and accepting his waiver of rights and pleas of guilty, the trial court found Carson guilty of three counts of assault of a public servant and

29

three counts of failure to appear.[15]  The trial court also found the enhancement paragraphs in each of the indictments alleging assault on a public servant were true.  As part of their agreement with Carson, the State abandoned the enhancement paragraph on the indictment for failure to appear.

After finding Carson guilty of the offenses, the trial court engaged in the following exchange with defense counsel:

> THE COURT:  . . . . Will, I think we're at the point now where you asked if you and Gary could both make a statement.
>
> MR. WILLIAMS:  Yes, Your Honor.
>
> THE COURT:  Whoever wishes to go first.  Now, Gary, you've talked to me in chambers -- I mean, not in chambers but in the courtroom.  You've talked to me outside of the courtroom.  You know you got to speak up.
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  He's all right, Will.
>
> THE DEFENDANT:  I want to apologize to Officer Jacobs.  I want to apologize to Officer Eudy and I want to apologize to Sergeant Michaels.  I want to apologize to the Court for not showing up last week.  I just ask that you have mercy on me that I can one day hopefully see my kids and see my family again.  That's all I have to say.

Immediately after Carson apologized, and without waiting to see if the State would call any witnesses or present any evidence or for the State to argue first, defense counsel began his final argument on sentencing.

> MR. WILLIAMS:  And, Your Honor, he apologized to each of the assault victims and to the Court for not showing up, asked for mercy.  And that's the same thing that we're asking for, Your Honor.  We'd ask that the Court run all these

---

[15]As the majority notes, during the course of the plea hearing, Carson collapsed and was attended to by court and emergency personnel.  After determining that Carson was physically well and that he wanted to continue, the trial court nevertheless recessed the proceedings to allow Carson to fully recover.  After a delay of one hour and fourteen minutes, the trial court reconvened the plea hearing.

sentences concurrently. We'd ask the Court to take into consideration while these were assaultive offenses, that there was bodily injury, but the bodily injury that was suffered was pain. Nobody was hospitalized. They were checked by a doctor, but no one was admitted, stayed overnight. There were no broken bones or long-lasting injuries to these. While that doesn't excuse his actions, we would like the Court to take that into consideration. We'd also like the Court to take into consideration as far as the bail jumping, Mr. Carson was scared. He was in a hopeless state. He ran because he was scared because of the consequences he was facing, which doesn't excuse it but may make it more understandable. We're asking the Court to sentence Mr. Carson to a significant amount of time, but we are asking the Court to sentence him somewhere at 35 years or below for this.

Defense counsel then argued,

MR. WILLIAMS: . . . . *The Court is aware of Mr. Carson's history.* We have made the Court aware of some medical issues. I don't know if this will draw an objection, but I didn't put on evidence of that. But it is partially mentioned in Defense 1. Mental health issues do run in his family. His mother is bipolar and schizophrenic. Mr. Carson's father was shot and killed by law enforcement when he was six to eight. No one's exactly sure of when that happened. Mr. Carson --

THE COURT: What was his father's name?

MR. WILLIAMS: It was in Dallas, Your Honor. It was not here, but Mr. Carson obviously after his early childhood had no relationship with his father who did have some criminal history. Mr. Carson is just asking the Court to, while taking his past into consideration, to take into consideration of the effects of his action this time and that thankfully no one was seriously hurt and that there are no long-lasting effects on that. And that's all we have to ask for, Your Honor.

(Emphasis added). The trial court then allowed the State to present its argument.

THE COURT: Kelley, does the State wish to address the Court before I sentence the defendant?

MS. CRISP: Yes, sir. This Court indicated to us today that 35 years was not acceptable, and I agree that it is not an acceptable number. *Mr. Carson, prior to the seven felonies that this Court has just found him guilty of, prior to that, he had 19 criminal convictions, 10 of which were felonies. Among those are carnal abuse on the Arkansas side, two failures to register as a sexual offender, burglary, possession charges. The list goes on and on. The assault on a public servant, as this Court knows, is among the most violent offenses and offensive to me.* I think

31

these officers, what they do every day, what we do in here will show them that we mean business and that if you assault a police officer, there are serious consequences. The legislature obviously meant for people in his position to be punished harshly because of the enhancement statute. We are planning to take full advantage of that today. I think 35 is not near what this individual deserves. I did waive my jury trial because I do believe this Court takes the safety of our officers very seriously, and I think that the State will get a fair and just sentence from the Court. And I will not lie, I do believe the safety of those around us have played a part in my decision. Mr. Carson has been agitated in this courtroom, and I feel like he does not need to be in society. I feel like he does not need to be around citizens. He does not need to be around women. He does not need to be around children, and he does not need to be around our officers. I think that his actions have shown that he cannot be among the good and lawful citizens, and he needs to go somewhere where he cannot hurt anybody else.

(Emphasis added).

After the State completed its argument, the trial court discussed his reasoning in determining the appropriate sentences.

THE COURT: All right, Gary, I can look you dead in the eye and tell you, I think that if we'd showed up at the courthouse tomorrow morning and selected a jury to hear this case, I would anticipate we would have been through, if we started the case Wednesday morning, I think we would have been through Wednesday afternoon or certainly Thursday morning. And having been the district attorney for 16 years and sitting on this bench now for about 55 months, there's no doubt . . . in my mind a jury would have given you 99 [years] or life. I mean, Mr. Williams, I would guess that that's been a part of the conversation you've had with Mr. Carson off and on for several weeks now. But Gary, you sit up here, and you watch cases come through and go through, and I can't read every one of them. But I'm just telling you, *I think because of your history, that's what a jury would have done to you.*

(Emphasis added). The trial court went on to discuss the parole law, and continued,

The point being, though, he would not have served 99 or life. You would have been eligible for parole after some period of time. Therefore, Will [defense counsel], I'm going to kind of use a benchmark of 60. I think that would be pretty close to what I would consider, I guess, the major amount of time the parole board or somebody would have considered in setting a parole date.

32

So based on that, in Cause Nos. 14F102-102, 14F103-102, and 14F161-102, I'm going to sentence him to a period of 50 years confinement in the Texas Department of Criminal Justice.

Immediately after pronouncing sentence, the trial court twice asked the question to defense counsel, "Anything else?" In response, defense counsel clarified that notwithstanding his in-court fainting spell, Carson was competent and wished to proceed with sentencing. He did not object to the trial court's consideration of his criminal history in determining the sentence, did not argue that the State's summary of that history was incorrect, and did not request the opportunity to supplement the record any further.

## C. The Hearing on Carson's Motion for New Trial

Carson subsequently filed a motion for new trial alleging various instances of ineffective assistance of his trial counsel. After the parties completed their presentation of evidence, the trial court elaborated in detail on the information that it had relied upon in arriving at the sentence in this case. In particular, the trial court stated that it relied on (1) Carson's criminal history as reflected in the State's Rule 404(b) notice; (2) the competency evaluation report of the court-appointed mental evaluation expert, Dr. Brian Smith; (3) entries from the medical records of Carson's treating physician which were referenced by Dr. Smith in his report; (4) entries from the trial court's docket minutes; and (5) the trial court's personal observations of Carson during the plea hearings when he fainted. The trial court also stated that it did *not* consider any prior criminal history or extraneous-offense history referenced in the Rule 404(b) notice that did *not* contain a cause number reflecting a final conviction and did not consider Carson's misdemeanor convictions. When the trial court completed its comments, Carson objected to the trial court's

33

consideration of the Rule 404(b) notices, but he did not object to any other information considered by the trial court.

### D. The Appeal

In his Brief on Appeal, Carson limits his objection to the trial court's consideration of his prior felony convictions that were listed in the Rule 404(b) notices.[16]

## II. The Trial Court's Error Was Non-Constitutional Error

### A. General Classifications of Error

Under Rule 44.2 of the Texas Rules of Appellate Procedure, there are five types of error: "(1) constitutional error that is not subject to harmless error analysis (i.e., structural error); (2) constitutional error that is harmful; (3) constitutional error that is harmless; (4) non-constitutional error that is harmful (i.e., affects a substantial right); [and] (5) non-constitutional error that is harmless (i.e., does not affect a substantial right)." *Carranza v. State*, 980 S.W.2d 653, 656 (Tex. Crim. App. 1998) (citations omitted). "A constitutional error within the meaning of rule 44.2(a) is an error that directly offends the United States Constitution or the Texas

---

[16]It could be argued on this record that Carson waived his complaint by failing to object to the State's summary of his criminal record as being outside the record or to the trial court's announcement that it considered that history in determining the sentence. Any error, including structural error, can be waived by failing to timely object. *See Johnson v. State*, 520 U.S. 461, 466 (1997) ("the seriousness of the error claimed does not remove consideration of it from the ambit of the Federal Rules of Criminal Procedure"). And an objection that an argument goes outside the record is also subject to waiver. *See Threadgill v. State*, 146 S.W.3d 654, 670 (Tex. Crim. App. 2004) ("[A]ppellant claims that the prosecutor committed reversible error when he argued outside of the record . . . . Because appellant failed to object to the jury argument, he has forfeited his right to raise the issue on appeal."). However, the 404(b) notice listed eleven more final felony convictions than were mentioned by the State in argument, and the trial court did not specify that it was relying on the Rule 404(b) notice at the sentencing hearing. Thus, although he knew the trial court was considering his criminal record in general, Carson did not know the full extent of his criminal record being considered by the trial court until after sentencing. In the absence of complete knowledge of what was being considered, I do not believe he could have waived his objection to the trial court's consideration of that undisclosed information. Accordingly, I believe that the interests of justice require us to address the merits of Carson's complaint.

Constitution without regard to any statute or rule that might also apply." *Alford v. State*, 22 S.W.3d

669, 673 (Tex. App.—Fort Worth 2002, pet. ref'd). By contrast, "[t]hose errors not similarly

related in nature to the Constitution, or that are so far distant from a related constitutional right as

to be diluted beyond any great potentiality for harm, are commonly characterized as non-

constitutional errors." Andrew Murr, *Texas Attempts to see the Light Through its own Muddied*

*Jurisprudential Waters: The Difficulties in Choosing the Applicability of Constitutional Versus*

*Non-Constitutional Reversible Error*, 34 TEX. TECH L. REV. 297, 314 (2003) (citing *Kotteakos v.*

*United States*, 328 U.S. 750, 765 (1946)).

> **B.** **The Due Process Clause of the Fourteenth Amendment Does Not Prohibit Trial Courts from Considering Out-of-Court Evidence in Deciding Punishment in a Non-Capital Case[17]**

More than sixty-five years ago, the United States Supreme Court ruled that unlike the

guilt/innocence stage of a trial, a trial court may consider out-of-court information in deciding

punishment during a non-capital case:

> [B]oth before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law. Out-of-court affidavits have been used frequently, and of course in the

---

[17]The Court of Criminal Appeals has held that the Texas Due Course of Law Provision, found at Article I, Section 19 of the Texas Constitution, provides "the same procedural rights and protections as the Due Process Clause" of the Fourteenth Amendment to the United States Constitution. *See Fleming v. State*, 341 S.W.3d 415, 416 n.1 (Tex. Crim. App. 2011) (Keasler, J., concurring); *see also Fleming v. State*, 376 S.W.3d 854, 858 (Tex. App.—Fort Worth 2012) (in opinion on remand, adopting concurring Judge Keasler's reasoning that "even though the court of criminal appeals has never rendered an opinion on either the scope of the due course of law provision or 'the substantive rights and protections' it provides, . . . there exists 'no reason to reach a contrary conclusion with respect to substantive rights and protections'"), *aff'd*, 455 S.W.3d 577, 583 (Tex. Crim. App. 2014). Accordingly, the only source for constitutional procedural rights at sentencing derive from federal due process.

> smaller communities sentencing judges naturally have in mind their knowledge of the personalities and backgrounds of convicted offenders.

*Williams v. New York*, 337 U.S. at 246 (citations omitted).  The Supreme Court went on to say,

> Modern changes in the treatment of offenders make it more necessary now than a century ago for observance of the distinctions in the evidential procedure in the trial and sentencing processes.  For indeterminate sentences and probation have resulted in an increase in the discretionary powers exercised in fixing punishments.  In general, these modern changes have not resulted in making the lot of offenders harder.  On the contrary a strong motivating force for the changes has been the belief that by careful study of the lives and personalities of convicted offenders many could be less severely punished and restored sooner to complete freedom and useful citizenship.

*Id*. at 248–49.  The Supreme Court then concluded, "The considerations we have set out admonish us against treating the due-process clause as a uniform command that courts through the Nation abandon their age-old practice of seeking information from out-of-court sources to guide their judgment toward a more enlightened and just sentence." *Id*. at 250–51.

Ten years later, in *Williams v. Oklahoma*, the Supreme Court reaffirmed its previous ruling in *Williams v. New York*.  *Williams v. Oklahoma*, 358 U.S. at 584.  In discussing the sentencing hearing in that case, the Supreme Court held that

> once the guilt of the accused has been properly established, the sentencing judge, in determining the kind and extent of punishment to be imposed, is not restricted to evidence derived from the examination and cross-examination of witnesses in open court but may, consistently with the Due Process Clause of the Fourteenth Amendment, consider responsible unsworn or 'out-of-court' information relative to the circumstances of the crime and to the convicted person's life and characteristics.

*Id*.[18]  Interestingly, the informal sentencing hearing in *Williams v. Oklahoma* was very similar to

the sentencing hearing in this case:

> After interrogating petitioner to make sure that he had entered the plea of guilty
> voluntarily and that he understood that he might be sentenced to death upon it, the
> court accepted the plea and adjudged petitioner guilty of the crime of kidnaping
> Cooke as charged.  Thereupon the court asked counsel for petitioner if he wished
> to be heard regarding the sentence to be imposed, and counsel replied that he
> preferred to reserve his statement until after the State's Attorney had spoken.  The
> State's Attorney then made a statement – reading much of it from a prepared
> statement – recounting the armed robbery of the filling station attendant and the
> following chase by and elusion of the Tulsa police; reciting the gruesome details of
> the kidnaping of Cooke in Tulsa County and of his murder in Muskogee County;
> stating petitioner's past criminal record as shown by the files of the Federal Bureau
> of Investigation; and concluding with a request for a death sentence.

*Id*. at 579–80 (footnotes omitted).

Defense counsel then introduced a transcript from a previous case involving the same

episode and made a plea for a life sentence, after which the court recessed.  *Id*. at 580.  Two days

later, the trial court reconvened the sentencing hearing to pronounce its sentence.

> Thereupon, the court sentenced petitioner to death, and in the course of his
> pronouncement the judge said, among other things, that he had considered the facts
> "which (had) been stated (by counsel) and which (petitioner had) admitted were
> (involved in) this crime (of kidnaping), committed in Tulsa County, which resulted
> in the murder of the victim, (all of) which the Court takes into consideration * * *
> as a continuing thing."

*Id*. at 580–81.  After noting that the Constitution does not require a formal sentencing proceeding,

the Supreme Court held, "These considerations make it clear that the State's Attorney's statement

of the details of the crime and of petitioner's criminal record – all admitted by petitioner to be true

---

[18]Although the Supreme Court subsequently disavowed the application of *Williams v. New York* and *Williams v. Oklahoma* to death penalty cases, *see Gardner v. Florida*, 430 U.S. 349 (1977), it has subsequently reaffirmed their holdings in non-capital cases.  *See United States v. Watts*, 519 U.S. 148, 151–52 (1997) (per curiam).

– did not deprive petitioner of fundamental fairness or of any right of confrontation or cross-examination." *Id*. at 584.

The majority argues that *Williams v. Oklahoma* is inapplicable to this case because the trial court did not ask Carson whether he agreed with the State's summary of his criminal history, whereas, the trial court in *Williams v. Oklahoma* did. While the majority is correct that such a distinction exists, I believe that the conclusion it reaches based on that distinction is incorrect.

The Supreme Court in *Williams v. Oklahoma* did not conclude that the defendant's due process rights were satisfied because the defendant agreed with the State's summary of his criminal history. In fact, the opinion in *Williams v. New York*, wherein the rule applied in *Williams v. Oklahoma* was adopted, does not indicate that the defendant was even asked if he agreed with the out-of-court information. Rather, the Supreme Court found that the New York and Oklahoma informal statutory sentencing schemes used in those cases satisfied due process because no due process right to a more formal sentencing proceeding exists.

Yet, the fact that the sentencing procedures in the *Williams* cases satisfied due process does not mean that anything less than that violates due process. In fact, in *Williams v. New York*, the Supreme Court held that "modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." *Williams v. New York*, 337 U.S. at 247. And the Supreme Court further noted that one of the historical sources for sentencing information included the trial court's personal "knowledge of the personalities and backgrounds of convicted offenders." *Id.* at 246. This and similar language from

38

the *Williams* cases indicates that a trial court has broad discretion to consider sentencing information from sources outside normal procedural and evidentiary rules. Accordingly, while perfect compliance with the procedures in the *Williams* cases would satisfy due process, any deviation from those procedures is not automatically a due process violation. Rather, any case deviating from the facts in the *Williams'* cases must be evaluated on a case-by-case basis. To read the *Williams* cases otherwise would mean that formality is required even though the cases specifically state that informality is permissible.

Of course, the fact that a sentencing hearing may be informal does not mean that there are no due process limits to informality. To use an absurd example, due process would not permit a trial court to sentence a defendant based on a social media poll. But it does not follow that a trial court's failure to perfectly comply with a statutory sentencing scheme is a due process violation. Under that reasoning, any error committed during a statutory sentencing hearing would become a due process violation, no matter how insignificant. Essentially, there would never be non-constitutional error in a sentencing phase even though the Supreme Court has held that there is no constitutional right to a formal sentencing hearing.[19]

---

[19]As will be discussed below, even if a sentencing hearing procedure satisfies due process, a due process violation could still occur during the course of that proceeding. For example, a trial court's consideration of a prior conviction obtained in violation of his right to counsel would violate due process even though the procedure by which the trial court received the prior conviction was constitutionally valid. *See United States v. Tucker*, 404 U.S. 443, 446–47 (1972) (holding that in sentencing, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come. . . . But these general propositions do not decide the case before us. For we deal here, not with a sentence imposed in the informed discretion of a trial judge, but with a sentence founded at least in part upon misinformation of constitutional magnitude." (citations omitted)). But at this point, I only address the question of whether the trial court's consideration of the adjudicated offenses listed in the non-admitted Rule 404(b) notice satisfied the procedural due process requirements for sentencing hearings. Carson argues, and the majority finds, that the trial court's consideration of this information rendered it biased in the performance of its duties, and I will address that issue later.

This case presents a clear example of that principle. The trial court here engaged in a lengthy plea hearing where it admonished Carson of his constitutional rights, accepted his waivers of those rights and his pleas of guilty, found him guilty, and found the enhancement paragraphs to be true. During the course of that proceeding, the court received and considered evidence in the form of medical records offered and admitted by Carson, information from Carson's previous competency evaluation, entries from the trial court's docket minutes, the nature of the offenses involved and the State's unobjected-to summary of his criminal history, and Carson's criminal history as reflected in the Rule 404(b) notice. The trial court then sentenced Carson to a term within the statutory range based on the information it had received and considered during both the plea hearing and the sentencing hearing. Consequently, I believe that the sentencing hearing in this case was sufficiently formal to satisfy due process notwithstanding the trial court's consideration of the Rule 404(b) notices at sentencing.[20]

---

[20]In fact, in a case involving identical facts as the present case, the Georgia Court of Appeals reached the same conclusion under federal due process principles:

> Prior to trial, the state advised the defendant in writing that in the event of a conviction, it intended to offer as evidence previous convictions of defendant. Exhibits showing these convictions were attached to the notice. At the sentencing hearing it was shown that the evidence of prior convictions had been previously tendered to the court and ordered filed with the clerk but not formally offered in evidence at the hearing. As the record of the previous convictions had been properly filed, this evidence was properly before the trial court. A ritualistic tender of this evidence at the hearing was not necessary.

*Henderson v. State*, 245 S.E.2d 437, 439–40 (Ga. Ct. App. 1978).

Moreover, the Court of Criminal Appeals has held that a trial court properly relied on an "unsigned, undated, and unsworn police report" offered at a suppression hearing under Article 28.01 of the Code of Criminal Procedure to determine that probable cause for arrest existed because "the statutory language supports the notion that a motion to suppress is an informal hearing in which the trial judge, in his discretion, may use different types of information, conveyed in different ways, to resolve the contested factual or legal issues." *Ford v. State*, 305 S.W.3d 530, 537–38 (Tex. Crim. App. 2009). In reaching this conclusion, the Court of Criminal Appeals analogized Article 28.01

Nevertheless, Texas statutory law does require a more formal sentencing hearing than that required by the Due Process Clause of the Fourteenth Amendment. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 2(b) (West Supp. 2016). It is under these statutory provisions that the trial court erred.[21]

### C. The Trial Court Erred in Failing to Follow the Procedures in Article 37.07 of the Code of Criminal Procedure and the Texas Rules of Evidence

Article 37.07, Section 2(b), provides that after a defendant has been found guilty, the trial court shall assess punishment unless the defendant filed a sworn motion for the jury to assess

---

suppression hearings to preliminary hearings under Rule 104(a) of the Texas Rules of Evidence and cited with approval to the following advisory comments from Rule 104(a) of the Federal Rules of Evidence:

> The United States Supreme Court, in the context of the post-trial sentencing stage, noted the important distinction between evidentiary rules applicable to trials before a jury and the common-law principles concerning a judge's discretion to use reliable sources of information to reach a "right result" . . . .
>
> . . . .
>
> In these instances, the judge should "not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial."

*Id*. at 535 n.20 (Tex. Crim. App. 2009) (quoting *Williams v. New York*, 337 U.S. at 246, 247).

[21]Clearly, due process would entitle a defendant to receive notice of what the trial court is relying upon in deciding punishment and the opportunity to be heard on that information, and nothing in my dissent is intended to suggest otherwise. If Carson had no knowledge the trial court was considering his criminal history in deciding his punishment in this case, I would agree with the majority that his right to due process had been violated. Yet, as is shown above, the record from the sentencing hearing makes clear that the trial court was considering Carson's criminal history in deciding punishment. What Carson lacked in this case was knowledge of the full extent of his criminal history being considered. Accordingly, the facts in this case lie somewhere between the facts in the *Williams* cases and a complete deprivation of due process, and the question here is whether the sentencing hearing in this case was too informal to satisfy due process. On this record, I believe that his due process rights were not violated, particularly in view of the fact that (1) the State argued his criminal history in detail, (2) Carson failed to object to the State's argument as being outside the record, (3) Carson failed to argue that the State's description of his criminal history was incorrect in any way, (4) the trial court announced it was basing its punishment determination on Carson's criminal history, and (5) Carson failed to object to the trial court's decision on the basis that there was no evidence to support it.

punishment prior to the commencement of the trial. *Id.* Section 3(a) states that during the sentencing phase of trial,

> evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a). Section 3(d) provides that "[w]hen the judge assesses the punishment, the judge may order an investigative report . . . and after considering the report, and after the hearing of the evidence hereinabove provided for, he shall forthwith announce his decision in open court as to the punishment to be assessed." TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(d) (West Supp. 2016). Rule 101(b) of the Texas Rules of Evidence provides that "[t]hese rules apply to proceedings in Texas courts except as otherwise provided in subdivisions (d)–(f)." TEX. R. EVID. 101(b). Finally, Rule 101(d) states,

> Despite these rules, a court must admit or exclude evidence if required to do so by the United States or Texas Constitution, a federal or Texas statute, or a rule prescribed by the United States or Texas Supreme Court or the Texas Court of Criminal Appeals. If possible, a court should resolve by reasonable construction any inconsistency between these rules and applicable constitutional or statutory provisions or other rules.

TEX. R. EVID. 101(d).

When Rule 101 and Article 37.07 are read together, it becomes clear that during the sentencing phase of a criminal trial in Texas, evidence must be presented to the court or jury pursuant to the Rules of Evidence, except (1) where information is provided to the trial court in

the form of a presentence investigation report, (2) where evidence is presented under Article 37.07(3)(a) of the Code of Criminal Procedure, or (3) where evidence is presented under Rule 101(d) of the Rules of Evidence. The Rule 404(b) notice in this case does not fall within any of these exceptions. Accordingly, the State should have introduced evidence to establish the criminal history referred to in those notices, and because it did not, the trial court erred in considering those notices under Texas statutory law.[22]

### D. Constitutional Error Can Occur During a Statutory Proceeding, But that Did Not Occur in this Case

Yet, the Court of Criminal Appeals has explained that even though due process requirements are not as stringent during the punishment phase as they are during the guilt/innocence phase, "a state's sentencing procedure is [not] 'wholly immune from scrutiny under the due-process clause.'" *Smith v. State*, 227 S.W.3d 753, 764 (Tex. Crim. App. 2007)

---

[22]We have previously held that under Article 37.07, Section 3(a), "the Legislature has effectively stated that trial courts are not required to follow the rules of evidence created by the Court of Criminal Appeals while conducting punishment hearings." *Enlow v. State*, 46 S.W.3d 340, 347 (Tex. App.—Texarkana 2001, pet. ref'd). We have also held that

> [a]rticle 37.07, as enacted by the Legislature, allows each individual sentencing court to dictate what evidence may be presented at the punishment phase of trial. Any matter the court deems relevant to sentencing is admissible. . . .
>     . . . .
>     Due process has not been violated by the relaxing of evidentiary rules at the punishment phase of the trial.

*Parker v. State*, 51 S.W.3d 719, 726 (Tex. App.—Texarkana 2001, no pet.). Based on this language, it could be argued that the trial court did not err in considering the Rule 404(b) notices under Article 37.07, either. Nevertheless, in both *Enlow* and *Parker*, the evidence in question was actually admitted into evidence at the sentencing hearings, and the defendants argued that the statutory authority for admitting that evidence was unconstitutional. While we held that the trial court did not err in admitting the evidence at the sentencing phase due to Article. 37.07's relaxation of the evidence rules at sentencing, we did not hold that the evidence need not have been admitted to be considered by the trial court at sentencing. The trial court in this case did not admit the Rule 404(b) notice or the purported judgments referenced therein, and therefore, it erred under Article 37.07 in considering that information. Yet, as will be explained below, that error was harmless.

(quoting *Williams v. New York*, 337 U.S. at 252 n.18). Carson asserts, and the majority has found, that a structural error occurred in this case because the trial court was biased against Carson based on its reliance on extra-judicial source information. Clearly, even if the sentencing proceeding satisfied due process, a due-process deprivation would occur if the presiding judge presiding over that hearing was biased. *Tumey v. State of Ohio*, 273 U.S. 510 (1927). Nevertheless, for the reasons stated below, the trial court's reliance on the Rule 404(b) notices does not rise to the level of bias necessary to constitute structural error.

### 1. A Trial Court's Reliance on Extrajudicial Source Information Does Not Constitute a Structural Error

In concluding that the trial court's error was structural, I believe that Carson and the majority merge two distinct concepts: trial court bias requiring recusal under the extrajudicial source doctrine and trial court bias which constitutes structural error. The extrajudicial source doctrine originated in a line of United States Supreme Court cases involving recusal of federal judges under Title 28, Section 455, of the United States Code, which is the federal recusal statute. *See Liteky v. United States*, 510 U.S. 540, 544–45 (1994). Under Section 455(a), "any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C.A. § 455(a) (West, Westlaw through P.L. 114-254). Section 455(b)(1) goes on to state that a "justice, judge, or magistrate judge of the United States" is disqualified if he possesses "personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C.A. § 455(b)(1) (West, Westlaw through P.L. 114-254). In

44

*Liteky*, the Supreme Court held that the "extrajudicial source" doctrine applies to both Section 455(a) and Section 455(b)(1). *Liteky*, 510 U.S. at 554.[23]

Rule 18b of the Texas Rules of Civil Procedure contains the same language as Section 455(b)(1). TEX. CIV. P. 18b(b)(3). Under Rule 18b(3), possession by the trial court of "personal knowledge of disputed evidentiary facts concerning the proceeding" is grounds for recusal. *Id*. Consequently, Texas courts have used the extrajudicial source construct as discussed in federal cases to determine whether recusal is required under Rule 18b. *See Kniatt v. State*, 239 S.W.3d 910, 920 (Tex. App.—Waco 2007, no pet.) (per curiam) (applying *Liteky*'s discussion of recusal based on "extrajudicial source information" to recusal under Rule 18b(3)); *see also Abdygapparova v. State*, 243 S.W.3d 191, 198 (Tex. App.—San Antonio 2007, pet. ref'd) ( "Bias sufficient to warrant recusal generally stems from an extrajudicial source and results in an outcome 'on the merits' based on information outside of what the judge learned from participating in the case at hand." (footnote omitted)).

In another line of cases, the Supreme Court has held that certain errors "are so intrinsically harmful as to require automatic reversal (i.e., 'affect substantial rights') without regard to their effect on the outcome." *Neder v. United States*, 527 U.S. 1, 7 (1999). Included among these

---

[23]In *Liteky*, the Supreme Court also held that a federal judge may also be disqualified on the basis of information he acquires through an intra-judicial source if the opinions formed by the judge on that information "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555. Nevertheless, there is no allegation that the trial judge displayed such favoritism or antagonism.

"structural" errors is a "biased trial judge," *Id*. at 8, or the "lack of an impartial trial judge."

*Johnson v. United States*, 520 U.S. 461, 469 (1997).[24] Errors are structural where

> Such errors "infect the entire trial process," and "necessarily render a trial fundamentally unfair." Put another way, these errors deprive defendants of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair."

*Neder*, 527 U.S. at 8–9. Carson and the majority equate the two lines of cases, and the majority holds that structural error exists as a result of a trial court's reliance on extrajudicial source information. Nevertheless, the two lines of cases are separate.

The Supreme Court has held that a structural error occurs when there is a violation of "some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman v. California*, 386 U.S. 18, 23 (1967). But the Supreme Court has also held that "[a] conclusion that a statutory violation [of Section 455 has] occurred does not . . . end our inquiry. As in other areas of the law, there is surely room for harmless error committed by busy judges who inadvertently overlook a disqualifying circumstance." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 862 (1988). Logically, recusal under Section 455 which is subject to review for harmless error cannot constitute structural error which "can never be treated as harmless."

---

[24]The Supreme Court held,

> We have found structural errors only in a very limited class of cases: *See Gideon v. Wainwright*, 372 U.S. 335 (1963) (a total deprivation of the right to counsel); *Tumey v. Ohio*, 273 U.S. 510 (1927) (lack of an impartial trial judge); *Vasquez v. Hillery*, 474 U.S. 254 (1986) (unlawful exclusion of grand jurors of defendant's race); *McKaskle v. Wiggins*, 465 U.S. 168 (1984) (the right to self-representation at trial); *Waller v. Georgia*, 467 U.S. 39 (1984) (the right to a public trial); *Sullivan v. Louisiana*, 508 U.S. 275 (1993) (erroneous reasonable-doubt instruction to jury).

*Johnson*, 520 U.S. at 468–69.

*Chapman*, 386 U.S. at 23. Therefore, extrajudicial source information bias is not the same thing as structural error bias.[25]

### 2. Even If Reliance on Extrajudicial Source Information Could Result in Structural Error Bias, the Rule 404(b) Notices In this Case Do Not Constitute Extrajudicial Source Information

Moreover, even if the reliance on extrajudicial source information could result in the kind of bias which constitutes structural error, the 404(b) notice in this case was not extrajudicial source information. The majority is correct that extrajudicial source information is defined as "[o]utside court" or "outside the functioning of the court system" and "[n]ot made as part of a judicial proceeding." *Roman v. State*, 145 S.W.3d 316, 321 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (quoting *Extrajudicial*, BLACK'S LAW DICTIONARY (7th ed. 1999)). Nevertheless, the courts examining this issue have consistently held that information a trial judge obtains by virtue of his status as judge, and which he does not obtain as a result of improper conduct, is not extrajudicial source information that creates bias sufficient to create a structural error.

For instance, in *United States v. Grinnell Corp.*, which was the seminal Supreme Court case establishing the extrajudicial source rule, the Supreme Court found that the trial court's review of depositions and the parties' briefs prior to trial at the request of defense counsel was not information obtained from an extrajudicial source. *United States v. Grinnell Corp*, 384 U.S. 563, 583 (1966). Likewise, in *Smith v. United States*, the Fifth Circuit Court of Appeals found that a trial court's review of a presentence report in determining the amount of bail was not extrajudicial

---

[25]Indeed, in *Abdygapparova*, the San Antonio Court of Appeals considered a question of recusal based on possession of extrajudicial source information separately from the question of whether the trial court was biased to the degree necessary to constitute structural error. *Abdygapparova*, 243 S.W.3d 191.

source information which constituted bias calling for his recusal, even though a federal criminal procedural rule prohibited the trial court from reviewing a presentence report prior to entry of a plea of guilty. *Smith v. United States*, 360 F.2d 590, 592 (5th Cir. 1966) (citing *Warren v. Richardson*, 333 F.2d 781, 784 (9th Cir. 1964)).[26]

On the other hand, in cases where the trial judges were found to possess extrajudicial source information, the judge either acquired the information while acting in a personal, non-judicial capacity or he acquired it in his judicial capacity through improper means. For example, in *Murray v. Scott*, the Eleventh Circuit Court of Appeals found that a trial judge was biased because he possessed extrajudicial source information where he had "personal knowledge of disputed evidentiary facts based on his involvement with [earlier litigation involving one of the parties] in which [the trial judge] participated as counsel of record, filed a brief, and received a letter from [the litigant's] attorney." *Murray v. Scott*, 253 F.3d 1308, 1312 (11th Cir. 2001).[27]

---

[26]Other courts have reached the same conclusion. The Georgia Supreme Court has held that "the involvement of the trial judge with the issuance of search warrants and orders for records was directly related to [the defendant's] case and was not 'extra-judicial.'" *Heidt v. State*, 736 S.E.2d 384, 390 (Ga. 2013). The Eleventh Circuit Court of Appeals has held that a judge's acquisition of information related to a stock-ownership dispute obtained in an in-chambers discussion between counsel discussing settlement was not extrajudicial. *United States v. Bailey*, 175 F.3d 966, 970 (11th Cir. 1999) (per curiam). Similarly, the Eleventh Circuit held that information discovered by a judge during an in-camera hearing between the defendant and government agent regarding a possible obstruction of justice scheme between the defendant's attorney and attorneys for co-defendants in other cases was not extrajudicial. *United States v. Sims*, 845 F.2d 1564, 1570 (11th Cir. 1988). Finally, the United States Bankruptcy Court for the Northern District of Georgia held that the court's discovery of contradictory testimony by a witness in a bankruptcy proceeding obtained while researching the law related to a different bankruptcy case was not extrajudicial. *In re Tyler*, 498 B.R. 373 (N.D. Ga. 2013).

[27]Similarly, in *United States v. State of Alabama*, the Eleventh Circuit Court of Appeals held that a trial judge was disqualified from hearing a Title VII case involving discriminatory funding of higher education institutions. *United States v. State of Alabama*, 828 F.2d 1532, 1544 (11th Cir. 1987) (per curiam), *superseded on other grounds by statute*, 29 U.S.C.A. § 794, *as recognized in Lussier v. Dugger*, 904 F.2d 661, 664 (11th Cir. 1990). The Court of Appeals noted that before he took the bench, the trial judge had represented "black high school principals in a race discrimination suit" which "left [the trial judge] with knowledge of facts that were in dispute in the instant case." *Id.* at 1545. In *Edgar v. K.L.*, the Seventh Circuit Court of Appeals found that a trial judge was biased by the possession

Consequently, in both cases where recusal was required and cases where it was not, the determinative factors were whether the trial judge was acting in his official capacity in a judicial proceeding when he obtained the information and, if so, whether he obtained the information through improper means. If the trial judge was acting as a judge when he acquired the information, and if he did not acquire the information through improper means, it did not arise from an extrajudicial source. On the other hand, if the judge acquired the information in his personal capacity, or if he acquired the information in his judicial capacity but through improper means, then the information was from an extrajudicial source and he was biased.[28]

---

of extrajudicial source information and thereby subject to recusal where he obtained the information through improper ex parte meetings with a panel of court-appointed experts retained to investigate the status of Illinois mental hospitals. *Edgar v. K.L.*, 93 F.3d 256, 259 (7th Cir. 1996) (per curiam). The Court of Appeals noted,

> Off-the-record briefings in chambers, by contrast, leave no trace in the record – and in this case the judge has forbidden any attempt at reconstruction. What information passed to the judge, and how reliable it may have been, are now unknowable. This is "personal" knowledge no less than if the judge had decided to take an undercover tour of a mental institution to see how the patients were treated. Instead of going himself, this judge appointed agents, who made a private report of how they investigated and what they had learned.

*Id.* Likewise, in *Abdygapparova*, the San Antonio Court of Appeals found that a trial judge who had engaged in ex parte communications with the State during the course of trial was biased and that her bias was a structural error. *Abdygapparova,* 243 S.W.3d at 207–10.

[28]Recently, we reversed the administrative judge's decision denying a defendant's motion for recusal where the trial judge acquired information from a spontaneous meeting occurring between the victim's family and the trial judge in the judge's chambers. *Duffey v. State*, 428 S.W.3d 319, 327 (Tex. App.—Texarkana 2014, no pet.). There, the trial judge took the defendant's plea of guilty and set sentencing for a later date, but indicated he intended to accept the prosecution's sentencing recommendation. *Id.* at 326–27. After the plea hearing, but prior to sentencing, the victim's family and their minister traveled to the courthouse to meet the district attorney and register their complaints about the recommended sentence. On their way to find the district attorney, the family saw the judge's office and decided to drop in and discuss the case with the judge. Although the judge repeatedly told the family he could not discuss the case with them, he nevertheless "listened to their concerns over and objections to the plea agreement and joined with them in a prayer for justice in the matter." *Id.* Subsequent to the meeting, the trial judge announced he was rejecting the plea agreement, and the defendant moved to recuse the judge. In reversing the administrative judge's order denying recusal, we held,

> While the recusal testimony indicates that the trial judge refused to discuss the details of the case during the ex parte meeting, he clearly listened to the concerns and objections of the [victim's

49

In the present case, the trial court obtained the information in his capacity as trial judge and did not acquire that information through improper means. Although the State's 404(b) notice was never offered or admitted in to evidence, it was on file in the district clerk's record, and the trial court reviewed it in its judicial capacity in the course of deciding an appropriate sentence for a defendant in a case filed in his court. The trial court did not do any independent investigation of the facts in this case. Nor did it engage in ex parte communications with any witness or any counsel for one of the parties. Rather, it read a document that was filed in the clerk's record in this case. While it was non-constitutional error for the trial court to consider the information in those notices because they had not been offered or admitted into evidence, it was not bias constituting structural error because the 404(b) notice was not obtained "outside the functioning of the court system" and was not obtained "[o]utside court," but instead was "made as part of a judicial proceeding." *Roman*, 145 S.W.3d at 321.

## E.    Summary—The Trial Court's Error Was Non-Constitutional

Accordingly, the sentencing hearing in this case was sufficiently formal to satisfy due process, the trial court's consideration of the Rule 404(b) notice was not structural error, and the information contained in that notice was not extrajudicial source information. Although Carson

---

families] regarding a sentencing decision that was not yet final. Allowing this trial judge, even if he were to sit mute, to meet privately with a crime victim's family and pastor regarding sentencing and unfinalized plea agreements would create a dangerous precedent that could produce injustice in other cases.

*Id*. at 327. Although the parties did not assert that the trial judge was biased because he had acquired extrajudicial source information, clearly, under the Supreme Court's precedent, the trial judge in *Duffey* acquired extrajudicial source information, because he engaged in an ex parte communication with the victims of the offense even though he did not initiate the conversation.

had a right to a more formal sentencing hearing, that right was statutory, not constitutional. Consequently, the trial court's error was non-constitutional.

## III. Under the Standard of Review Applicable to Non-Constitutional Error, the Trial Court's Error Was Harmless

### A. Introduction and Standard of Review

Because the trial court's error in this case was non-constitutional, we are required to evaluate harm under Rule 44.2(b) of the Rules of Appellate Procedure. Rule 44.2(b) states that "[a]ny other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). This standard requires a two-part analysis. First, "[t]o determine whether an error 'affect[ed] substantial rights,' we consider whether a party had a right to that which the error denied." *Johnson v. State*, 72 S.W.3d 346, 348 (Tex. Crim. App. 2002). Second, if the appellate court determines that the defendant had a right to that which was denied, then the appellate court must determine whether that "substantial right" was "affected" by the error. In making this determination, we "balance three factors: (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of the punishment assessed absent the misconduct (likelihood of the same punishment being assessed)." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

In this case, the substantial right could be defined in one of two ways. On the one hand, the substantial right could be defined as a right to a particular outcome: namely, a lesser sentence than the one received. One the other hand, the substantial right could be defined as a right to a particular procedure: namely, the right to see and confront the evidence considered by the trial

51

court in determining its sentences. Yet, as will be shown below, regardless of which definition is used, the trial court's error was harmless.

**B.       Carson Did Not Have A Substantial Right to A Lesser Sentence**

Although there are numerous cases evaluating whether error occurring during the sentencing phase of a jury trial is harmful, few cases evaluate error occurring during the sentencing phase of non-jury cases. Yet, by analogy, cases in which trial courts decide punishment in community supervision revocation cases are helpful.

In *Smith v. State*, the Houston Fourteenth Court of Appeals ruled that a trial court's violation of Article 36.02 of the Code of Criminal Procedure by allowing the State to reopen its case after the parties had made their closing arguments during a community supervision revocation proceeding was harmless for two reasons. *Smith v. State*, 290 S.W.3d 368, 375–77 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd). First, the court of appeals noted, "Because any one of the violations alone would be sufficient to affirm the trial court's order, appellant cannot show that he was harmed by any erroneously admitted testimony . . . that was unrelated to these six specific findings." *Id*. at 375. Second, the court of appeals noted, "[A] penalty assessed within the proper punishment range generally will not be disturbed on appeal." *Id*. at 376. Thus, the court concluded,

> Appellant received a sentence on the lower end of the range permitted by the statute. Considering the weight of the evidence and the entirety of the record, as we must, we cannot say that Herrera's untimely testimony affected a substantial right of appellant because he had no right under the governing statute to receive a lower sentence than the trial court imposed.

*Id*. at 376–77.

52

Additionally, the Court of Criminal Appeals has held that because Rule 44.2(b) is virtually identical to Rule 52(a) of the Federal Rules of Criminal Procedure, and because the comments to Rule 44.2(b) state that Rule 44.2(b) was "taken from . . . [Rule] 52(a) without substantive change," "it would seem that we only need look to the federal court's application of 52(a) for guidance regarding the proper standard of review to apply in our 44.2(b) situations." *Carranza*, 980 S.W.2d at 657 (quoting TEX. R. APP. P. 44.2 notes and cmts.). In federal cases, where trial judges decide sentencing in all non-capital cases under the Federal Sentencing Guidelines, the courts have held that "[i]n inquiring whether the defendant-appellant's substantial rights have been affected, the 'proper question here is whether the defendant can show a reasonable probability that, but for the district court's misapplication of the Guidelines, he would have received a lesser sentence.'" *United States v. Jasso*, 587 F.3d 706, 713 (5th Cir. 2009) (quoting *United States v. Villegas*, 404 F.3d 355, 364 (5th Cir. 2005) (per curiam), *superseded on other grounds by regulation*, *United States v. Pimpton*, 558 Fed. Appx. 335 (5th Cir. 2013)).[29]

In the present case, the trial court imposed a sentence that was within the applicable sentencing range, and there is nothing to show that but for its error in considering the Rule 404(b) notices, Carson would have received a lower sentence. In fact, the record reveals that Carson pled guilty to three counts of assault on a public servant that were enhanced by prior convictions and

---

[29]In *Jasso*, the defendant asserted that the trial court miscalculated his criminal history points, causing it to utilize the improper sentencing range. *Jasso*, 587 F.3d at 713. However, the court of appeals observed that even when corrected, the sentence imposed was still within the corrected sentencing range. *Id.* Accordingly, the court of appeals held, "Given this set of circumstances, we conclude that Jasso cannot demonstrate a 'reasonable probability, but for the district court's misapplication of the Guidelines, he would have received a lesser sentence.'" *Id.* at 713–14 (quoting *Villegas*, 404 F.3d at 364).

three counts of bail jumping and that he pled true to two prior felony offenses, including one charge for carnal knowledge of a child in Arkansas. Even if the trial court had completely ignored Carson's prior criminal history, given the nature of the offenses of which he was found guilty, the number of them, the true pleas to two prior felony convictions, and the fact that the sentencing range for the three counts of assault on a public servant was a minimum of twenty-five years and a maximum of ninety-nine years or life in prison, I believe that we cannot say that the imposition of three concurrent fifty-year sentences for three counts of assault on a public servant and three concurrent ten-year sentences for bail jumping was harmful. Accordingly, if the substantial right is defined as a right to a lesser sentence, Carson had no such right and his substantial rights were not affected. Therefore, the error was harmless.[30]

### C. Carson Did Not Have A Substantial Right to the Introduction of Evidence Supporting His Criminal and Social History

The more difficult question is whether the trial court's error is harmless if the substantial right denied is defined as the right to see and confront the evidence against Carson in a trial setting. Because Article 37.07 creates a statutory framework for consideration of out-of-court information

---

[30]The majority holds that because the sentence the trial court imposed was fifty-eight percent more burdensome than the thirty-five-year sentence recommended in the parties' proposed plea agreement—that the trial court rejected—then Carson has demonstrated harm. Yet, the majority's analysis assumes that Carson would have receive a thirty-five-year sentence, but for the trial court's error. However, the trial court's rejection of the proposed thirty-five-year sentence was not a result of any error, but was a proper exercise of a "trial court['s] . . . broad discretion to accept or reject the State's sentencing recommendation." *In re Duffey*, 459 S.W.3d 216, 223 (Tex. App.—Texarkana 2015, orig. proceeding) (citing *Ortiz v. State*, 933 S.W.2d 102, 110 (Tex. Crim. App. 1996)); *see also Smith v. State*, 243 S.W.3d 722, 726 (Tex. App.—Texarkana 2007, pet. ref'd) ("By long-standing authority, the trial court is 'free in every or any case to refuse to allow plea bargaining or to reject a particular plea bargain entered into by the State and the defense.'"). As a result, Carson did not have a substantial right to a thirty-five-year sentence. Because the only error committed by the trial court was in considering the criminal history information contained in the State's Rule 404(b) notice, Carson must show that he had a substantial right to a sentence of less than fifty years independent of the rejected sentencing recommendation. For the reasons cited above, he has not done so.

during punishment hearings, it is, at first blush, difficult to imagine how a trial court's consideration of information outside of that framework could be harmless. Yet, a review of the entire record of this proceeding in view of the applicable standards of review, compels the conclusion that even if the trial court had perfectly complied with Article 37.07, Carson would not have received any additional notice, information, or opportunity to object or supplement the record than he actually received in this case.

Had the trial court, pursuant to Article 37.03(d), requested the Bowie County Community Supervision and Corrections Department to prepare a presentence investigation (PSI) report, one of the mandatory items which would have been included in that report is Carson's criminal history. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 9(a) (West Supp. 2016). Carson could not have objected to the contents of that report on the basis that it would allow the trial court to consider unadjudicated extraneous offenses in violation of his Sixth Amendment right to confront the witnesses against him. *See Stringer v. State*, 309 S.W.3d 42, 48 (Tex. Crim. App. 2010). Therefore, (1) because the information contained in the Rule 404(b) notices was exactly the same information that would have been contained in a PSI report, (2) because Carson could not have objected to the trial court's consideration of that history had the trial court requested a PSI report, (3) because Carson had received not only a copy of the Rule 404(b) notice before trial, but also received copies of the judgments of conviction for the extraneous offenses listed in that notice, (4) because the State summarized his criminal history in its closing argument, (5) because the trial court told Carson at the sentencing hearing that it was basing its decision on his criminal history, (6) because Carson did not object to the State's argument as being outside the record or to the trial

court's consideration of his criminal history at the sentencing hearing, or offer to supplement it in any way, (7) because the trial court limited its consideration of the Rule 404(b) notice to the final convictions contained therein and nothing else, and (8) because the other information properly before the trial court would itself have supported the sentences Carson received even in the absence of the criminal history contained in the Rule 404(b) notice, then it cannot be said that Carson was harmed by the trial court's consideration of the Rule 404(b) notice.[31] Consequently, even if the substantial right allegedly denied is defined as the right to see and confront the evidence against him in a trial setting, the trial court's error did not deprive him of a substantial right in this case.

---

[31]It is true that a defendant has a right to "comment on a presentence investigation or a postsentence report and, with the approval of the judge, introduce testimony or other information alleging a factual inaccuracy in the investigation or report," after examining the report at least forty-eight hours prior to sentencing. TEX. CODE CRIM. PROC. ANN. art. 42.12, § 9(d)–(f) (West Supp. 2016). It is also true that Carson did not learn the State was relying on the Rule 404(b) notice until after the sentencing hearing was held. Nevertheless, as discussed above, Carson knew the State was arguing his criminal history and that the trial court was relying on it in determining sentence, and Carson failed to object. Accordingly, even though I do not believe Carson's failure to object waived his complaint for appeal in the absence of full knowledge of what was being considered, *see supra* note 2, I do believe his general knowledge that this information was being considered, combined with his failure to object, is a factor to be considered in addressing whether he was harmed by the trial court's error. On this record, it would be similar to a defendant receiving a PSI report missing one of several pages of his prior criminal convictions, ignoring the details of what was being considered, and then arguing on appeal that he was harmed because he did not know the full extent of the criminal history being considered. It may not be waiver, but it certainly impacts whether he was harmed in the absence of any information indicating missing information was incorrect.

Nevertheless, my dissent should not be read as an endorsement of the sentencing hearing in this case. The trial court erred in considering the Rule 404(b) notices because they were not admitted into evidence. Due to the factors listed, and particularly the fact that the trial court did not consider any of the unadjudicated extraneous offenses contained in the notice, I believe the trial court's error was harmless. *See Tamminen v. State*, 653 S.W.2d 799 (Tex. Crim. App. 1983) (holding that no due process violation requiring new trial occurred despite trial court's ex parte receipt of Texas Department of Public Safety Report detailing activities of motorcycle gang to which the defendant belonged and which mentioned the defendant—even though the report was provided to the trial court by the State's attorney who informed the trial court the report was classified, was not available to the public, and was not provided to defense counsel—where the trial court stated at sentencing that he was basing his sentencing decision solely on the testimony by the complaining witnesses during the guilt/innocence phase of trial and nothing else). Yet, it is difficult to imagine a set of facts outside the present case where I would make the same conclusion.

## VI.    Conclusion

In conclusion, the trial court erred in considering the Rule 404(b) notice that was not offered or admitted into evidence at the sentencing hearing.  Yet, for all of the foregoing reasons, I believe that the trial court's error in this case was not fundamental, was not constitutional, and under Rule 44.2(b), was not harmful.  Therefore, I respectfully dissent.

Ralph K. Burgess
Justice

Date Submitted:     July 27, 2016
Dated Decided:      January 31, 2017

Publish